IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| STEPHEN HALL, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 08-5020 |
| | : | |
| MICHAEL RAECH, JOSEPH CARBONI | : | |
| and CITY OF COATESVILLE, | : | |
| | : | |
| Defendants. | : | |


**MEMORANDUM**

YOHN, J.                                                                        January __, 2010

      Plaintiff, Stephen Hall, sues the City of Coatesville and two City police officers, Michael

Raech and Joseph Carboni, seeking damages and other relief pursuant to 42 U.S.C. § 1983 and

state law.  Plaintiff's claims stem from an incident in which he encountered the defendant

officers while suffering a diabetic episode.  Plaintiff alleges that Raech and Carboni violated his

Fourth Amendment rights by "seizing" him when it should have been apparent that he was

experiencing a medical emergency and by using excessive force in doing so, and that the City of

Coatesville is liable for failing to train its police force properly.  Plaintiff also sues Raech and

Carboni for assault and battery under state law.  All three defendants have filed a joint motion for

summary judgment.  Upon consideration of defendants' motion, plaintiff's response, and

defendants' reply, and for the reasons set forth herein, the court will grant in part and deny in part

the motion.

# I. Factual Background[1]

Plaintiff is an insulin-dependent, brittle[2] diabetic. (Defs.' Mot. for Summ. J. ["Defs.' Mot."] ¶ 7; Pl.'s Resp. to Defs.' Mot. for Summ. J. ["Pl.'s Resp."] ¶ 7; Pl.'s Dep. 110.) On July 21, 2007, plaintiff attended a birthday party for his teenage son at the home of his ex-wife. (Defs.' Mot. ¶¶ 5-6; Pl.'s Resp. ¶¶ 5-6.) Although plaintiff checked his blood sugar before leaving the party to make the eight mile drive home, he suffered a diabetic episode, also known as insulin shock, when he was within a few blocks of his own residence. (Defs.' Mot. ¶¶ 7-8; Pl.'s Resp. ¶¶ 7-8.) As part of this episode, plaintiff became confused and disoriented. (Defs.' Mot. ¶ 9; Pl.'s Resp. ¶ 9.) He did not know where he was and made a wrong turn, even though he was within two blocks of his home. (Defs.' Mot. ¶ 9; Pl.'s Resp. ¶ 9.) He also experienced blurry and double vision, minor trembling, and sweating. (Defs.' Mot. ¶ 10; Pl.'s Resp. ¶ 10.) Plaintiff was aware at the time that he was having an insulin shock episode, and he started drinking a soda in an effort to adjust his blood sugar. (Pl.'s Dep. 28-30.) While still experiencing the symptoms of insulin shock, plaintiff attempted to turn his truck around and backed into a telephone pole. (Defs.' Mot. ¶ 11; Pl.'s Resp. ¶ 11; Pl.'s Dep. 29.) He then continued on, driving past his house and turning into the driveway of an industrial park two blocks away in order to "come back and park [his] vehicle in front of [his] house." (Pl.'s Dep. 30, 33-34.)

At 9:36 p.m., a resident who identified himself as Denton Rummel called 911 and

---

[1] For purposes of this motion for summary judgment, I must accept the plaintiff's verison of the facts as true.

[2] Plaintiff testified that being a "brittle" diabetic "means you're not under control all the time." (Pl.'s Ex. A ["Pl.'s Dep."] 110.)

reported that a dark colored truck "driving slowly up and down [an] alley" had run into a

telephone pole and had run through a stop sign. (*See* Defs.' Ex. C (Tr. of 911 call).) Rummel

also reported that the vehicle had headed westbound on Charles Street[3] and that the driver was a

male of unknown race who was wearing a white t-shirt and appeared to be intoxicated. (*See id.*)

Officer Raech received a radio call to respond to the situation at 9:38 p.m., and he arrived at the

industrial park at the intersection of 11th and Charles Streets at 9:42 p.m. (Defs.' Mot. ¶ 15; Pl.'s

Resp. ¶ 15; Defs.' Ex. D (Coatesville Police Department Incident Investigation Report).) Within

moments, Officer Carboni also arrived at the scene. (Pl.'s Ex. B ["Raech Dep."] 144-45.)

Finding plaintiff's pickup truck stopped but still running in the entrance to the industrial park,

Raech approached the driver's side of the vehicle. (Defs.' Mot. ¶ 17; Pl.'s Resp. ¶ 17; Raech

Dep. 79.) The parties offer differing accounts of the encounter that followed.

Plaintiff testified that two Coatesville Police officers approached the truck, one at the

driver's side door and the other in the front, and told him to shut the vehicle off. (Pl.'s Dep. 36-

37.) Plaintiff complied and said, "I'm diabetic. I think my sugar dropped." (*Id.* at 37-38.)

Plaintiff also testified that he was wearing a medical alert necklace on the outside of his shirt at

the time of the encounter with Raech and Carboni, and that there was a medical alert decal on the

driver's side of the front windshield of the truck.[4] (*Id.* at 74-75, 85-86.) Although plaintiff

---

[3] It appears from the 911 transcript that Rummel called from a location on Eighth Avenue, between Charles and Concord Streets. (*See id.*)

[4] Plaintiff also asserts that there was "a medical bag on the passenger side seat, also in plain view." (Pl.'s Mem. 2; *see also* 1st Am. Compl. ¶ 22.) At his deposition, plaintiff testified that he had equipment to test his blood and glucose gel in his truck (Pl.'s Dep. 33, 56, 64); however, the deposition testimony does not address where in the truck this equipment was located and what the exterior of the bag looked like that would identify it as a medical bag, and plaintiff does not provide a citation to the record in support of his assertion that the medical

acknowledged that he probably was not speaking clearly, as speech problems are part of the

syndrome that goes with insulin shock, he nevertheless believed that he was speaking in a way

that the officers could understand.[5] (*Id.* at 42-43.) The officers then told plaintiff to "get out of

the vehicle now." (*Id.* at 38.) Plaintiff reached for his seat belt, but before he could unfasten it,

the officers grabbed him by the left shoulder and the back of his jeans and "[f]lipped [him] head

first onto the road," ripping his right back pocket. (*Id.* at 38, 45-47.) Plaintiff hit the pavement

head first, and an officer then "jumped on [his] back, on [his] shoulders very hard." (*Id.* at 38.)

Plaintiff testified that as his left hand was pulled back, he felt someone "either jumping on,

hitting or kicking [his] legs." (*Id.*) Because he was in pain, plaintiff was thrashing his upper

body and trying to move his legs while the officers were attempting to handcuff him, even though

they had told him to hold still. (*Id.* at 81-84.) Once the officers had handcuffed plaintiff, Raech

patted him down and discovered his insulin pump. (Raech Dep. 97-98.) The officers then "sat

[plaintiff] up with [his] knees up in the middle of the road" before picking him up and leaning

him—still handcuffed—against the tailgate of his truck. (Pl.'s Dep. 38, 54, 56.)[6]

---

supplies would have been clearly visible to anyone approaching the driver's window.

[5] Plaintiff also acknowledged that it is possible that he flailed his arms while he was in the truck because "part of being in an insulin reaction" is that "[y]our mobiles are off" such that "[i]f you go to reach for something, . . . you don't make the target hit." (*Id.* at 41-42, 47, 116.) However, plaintiff did not remember having done so. (*Id.* at 47.)

[6] Raech's testimony, which a jury could accept but is not relevant here, presents a different picture. Raech testified that when he approached the driver's side of the truck, he proceeded to ask plaintiff a series of general questions through the open window—*e.g.*, "who he is, where is he coming from, where is he going"—but got "no answers that were to my question" from plaintiff, who was "getting agitated" and flailing his arms and legs. (Raech Dep. 81-83.) Raech opened the driver's side door to get a better view of the interior of the truck and then reached in and turned the truck off, grabbing plaintiff's wrist and pushing him back against the seat in order to do so. (*Id.* at 82-84.) Raech then removed plaintiff from the vehicle, pulling

It is undisputed that after Raech and Carboni discovered plaintiff's insulin pump, one of the officers at the scene[7] called an ambulance at 9:50 p.m., and that the ambulance arrived at 9:59 p.m. (Defs.' Mot. ¶¶ 27-28; Pl.'s Resp. ¶¶ 27-28; Defs.' Ex. G (ambulance records).) A paramedic confirmed that plaintiff's blood sugar was low and treated him with two glucose packs (Defs.' Mot. ¶ 29; Pl.'s Resp. ¶ 29), and the ambulance departed by 10:21 p.m. (*see* Defs.' Mot. ¶ 31; Pl.'s Resp. ¶ 31). Plaintiff testified that he remained handcuffed while the paramedic was treating him.[8] (Pl.'s Dep. 59-60.)

Plaintiff testified that, as a result of the incident, he had immediate pain in his left shoulder, left elbow, neck, ribs, and head, which had hit the pavement when he was taken to the ground, causing an abrasion on his left temple. (Pl.'s Dep. 82-84.) Plaintiff also suffered bruising around his right shoulder blade and right side, just above the belt line, and scrapes on his left knee and elbow (*id.* at 89-91), and he has continued to have back, neck, and shoulder pain for

---

him forward by the wrist with one hand and placing his other hand on plaintiff's back in the shoulder blade area, and took him from the truck to the ground. (*Id.* at 84-86, 108-09.) Raech testified that plaintiff landed on his feet outside of the truck before being taken to the ground (*id.* at 90), and he specifically denied ripping the back pocket of plaintiff's jeans (*id.* at 108-09). Raech also stated that although plaintiff resisted his effort to take control of him, attempting to pull away from Raech and "flailing about," plaintiff was not attempting to hurt him. (*Id.* at 85-86.) While plaintiff was "flailing about" on the ground, Raech and Carboni handcuffed him (Raech Dep. 94-95; Defs.' Ex. F ["Carboni Dep."] 34), and Raech then patted him down and found his insulin pump (Raech Dep. 97-98).

[7] Plaintiff testified that a total of five cars and five officers from Coatesville and Valley Township responded to Rummel's 911 call, although only three cars were at the scene initially. (Pl.'s Dep. 34-36, 62.) According to plaintiff, one of the Valley Township officers told him that he had called an ambulance. (*Id.* at 56.) That same officer denied plaintiff's request to use supplies in his truck to test his blood. (*Id.*)

[8] Although Raech did not recall when, exactly, the handcuffs were removed or who removed them, he testified that they were "[a]bsolutely" removed before the ambulance arrived. (Raech Dep. 101.)

which is still being treated (*id.* at 99-100; *see also* Pl.'s Ex. C (Apr. 20, 2009, letter from Dr. Carl E. Hiller to plaintiff's attorney)).

In October 2008, plaintiff filed the instant lawsuit, naming as defendants Raech and the City of Coatesville Police Department, as well as the Valley Township Police Department and Valley officer Jeffrey Giannini. The defendants moved to dismiss the complaint, and by order dated March 25, 2009, the court granted in part and denied in part defendants' motions. Pursuant to the parties' stipulation, the court later dismissed the claims against Giannini and the Valley Township Police Department on April 15, 2009, and plaintiff thereafter filed an amended complaint against Raech, Carboni, and the City of Coatesville. Defendants now have moved for summary judgment as to all claims against them.

## II.    Summary Judgment Standard

A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A factual issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to avoid summary judgment, the nonmovant must make a showing sufficient to establish each essential element of its case

with respect to which it will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation and internal quotation marks omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.    Discussion

### A.      Fourth Amendment Claims Against Raech and Carboni

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Raech and Carboni do not dispute that they "seized" plaintiff within the meaning of the Fourth Amendment during their encounter with him. (Defs.' Mem. 5-6.) For his § 1983 claims against the defendant officers, plaintiff challenges the reasonableness of this seizure in several respects. Plaintiff asserts two counts of "Unreasonable Seizure," one against each officer, alleging that the seizure was unreasonable because Raech and Carboni should have recognized that plaintiff was experiencing a medical emergency and responded accordingly. (1st Am. Compl., Counts I & II.) He also asserts two counts of "Unreasonable Force," alleging that the seizure was unreasonable by virtue of the excessive force used by the officers in effecting it. (*Id.*, Counts III & IV.)

Raech and Carboni argue that summary judgment must be granted as to plaintiff's Fourth

Amendment claims because plaintiff has not produced evidence from which a reasonable juror could conclude that his constitutional rights were violated. (*See* Defs.' Mem. 5-9.) They also invoke the defense of qualified immunity, arguing that even if plaintiff's evidence is sufficient to show a constitutional violation, the right infringed was not clearly established at the time of the incident. (*See id.* at 9-12.) The court will address these issues separately as to plaintiff's unreasonable seizure and unreasonable force claims.

### 1.    Unreasonable Seizure (Counts I and II)

#### a.    Constitutional Violation

Although the parties do not identify the precise point in time at which plaintiff was seized by the defendant officers, it is clear that a seizure had occurred by the time the officers approached his truck, one at the driver's side door and one in front of the truck, and told him to "shut the vehicle off" and to "get out of the vehicle now." A seizure "does not occur every time a police officer approaches someone to ask a few questions." *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003). However, by plaintiff's account, Raech and Carboni approached the truck and immediately ordered him to turn it off—a request with which plaintiff contends he complied right away—and then to get out of the vehicle. By the time the officers approached, moreover, at least three police cars with flashing lights had arrived on the scene. In these circumstances, a reasonable person would not have felt "'free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). Accordingly, it is clear that the officers' actions resulted in a seizure by this point. *See Johnson*, 332 F.3d at 206 (seizure occurred when officer who approached parked van in which plaintiff was seated persisted in requesting that plaintiff

roll down his window even after plaintiff initially declined to do so, thus making it "clear that [plaintiff] was not free to ignore him and would not be left alone until he complied").

Plaintiff's seizure by the defendant officers is analogous to a traffic stop or investigative detention. Under *Terry v. Ohio*, 392 U.S. 1 (1968), and subsequent cases, an officer may, consistent with the Fourth Amendment, conduct this kind of "brief, investigatory stop" when the officer has "a reasonable, articulable suspicion" that "criminal activity is afoot," or, in the case of a traffic stop, that an individual has violated the traffic laws. *United States v. Delfin-Colina*, 464 F.3d 392, 396-97 (3d Cir. 2006) (internal quotation marks and citations omitted). Such an investigative detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). Moreover, the officers' actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. An investigative detention that goes on for an unreasonable amount of time or is carried out by unreasonably intrusive means may at some point become a *de facto* arrest for which probable cause is required. *See United States v. Sharpe*, 470 U.S. 675, 685-87 (1985) (recognizing that prolonged detention may become a *de facto* arrest where delay is unnecessary to officers' legitimate investigation); *Royer*, 460 U.S. at 502-03 (finding that when suspect was brought into a police interrogation room for questioning, he was, "[a]s a practical matter, . . . under arrest"). Thus, to evaluate whether plaintiff's seizure violated the Fourth Amendment, the court must consider not only whether the seizure was justified at inception but also whether it remained justified throughout its duration.

Defendants argue that they were justified in stopping plaintiff for investigation based on Rummel's 911 call reporting a dark colored truck being driven erratically in the vicinity where

plaintiff was parked. (Defs.' Mem. 6.) Plaintiff does not dispute that defendants were justified

in undertaking at least some investigation.[9] (Pl.'s Resp. ¶ 36 (plaintiff "is not alleging a lack of

probable cause for the original investigation"); Pl.'s Mem. 5 (plaintiff "does not contest the

reasonableness of the initial investigation").) Rather, plaintiff contends that the seizure was

unreasonable (1) because "upon contact with [plaintiff] the investigation should have

immediately become a medical emergency response" (1st Am. Compl. ¶¶ 36, 52), and (2)

because of "the method with which the defendant(s) carried out the investigation [and] the

seizure."[10] (Pl.'s Mem. 5).

---

[9] A 911 call reporting criminal activity may supply the reasonable suspicion needed to justify an investigatory stop where the tip possesses sufficient indicia of reliability, in light of the totality of the circumstances. *See United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008). In *Torres*, the Third Circuit held that a 911 call by an unnamed taxi driver who described seeing a man brandish a gun at a gas station supplied reasonable suspicion for a subsequent traffic stop where the taxi driver was an eyewitness who had recently observed criminal activity, the content of the tip was relatively detailed and given in a play-by-play fashion, the tipster provided identifying information about himself, and the criminal activity was described in some detail. *Id.* at 211-13. As in *Torres*, the 911 caller in this case was an eyewitness who provided a play-by-play description of plaintiff's erratic driving. Although the content of Rummel's tip was somewhat less detailed than the tip in *Torres*, in that Rummel did not initially provide the make and model of plaintiff's vehicle or his license number, it is significant that Rummel freely identified himself and his location. *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (distinguishing between an anonymous telephone tip and a tip from a known informant in part on the basis that there is recourse against the latter should the tip prove to be incorrect); *Torres*, 534 F.3d at 212 (finding it significant that tipster "neither attempted to, nor had any reason to, conceal his identity"); *Commonwealth v. Anthony*, 977 A.2d 1182, 1187-88 (Pa. Super. Ct. 2009) (911 call from a named citizen informant who observed a dark blue Buick being driven erratically—including almost striking a bridge, running a stop sign, and driving onto a sidewalk—and who provided the location and registration number of the vehicle, sufficed to provide officer with reasonable suspicion to believe that driver violated the Motor Vehicle Code).

[10] Plaintiff also challenges "the unreasonable force and violence used" in effecting the seizure. (Pl.'s Mem. 5.) A seizure can be unreasonable by virtue of the force used in carrying it out. *Graham*, 490 U.S. at 395. Because plaintiff has pleaded separate Fourth Amendment claims for unreasonable force against Raech and Carboni (*see* 1st Am. Compl., Counts III & IV),

10

As to the former argument, plaintiff has produced evidence from which a reasonable juror could conclude that the defendant officers should have recognized that plaintiff was suffering from a medical condition.  Plaintiff himself testified that there was a medical alert decal on the driver's side of the front windshield of his truck, that he was wearing a medical alert necklace on the outside of his shirt at the time of the incident, and that he informed the officers that he was diabetic and suffering from low blood sugar as soon as they approached.  (*See* Pl.'s Dep. 37-38, 74-75, 85-86.)  In addition, plaintiff has produced the report of his Law Enforcement Policy, Practice and Procedure expert, James A. Williams, in which Williams opines that a "reasonable, well trained, and prudent thinking police officer" would have seen and recognized the medical alert decal and necklace.[11]  (Pl.'s Ex. D (report of James A. Williams, hereinafter cited as "Williams Report") 6-7.)  Even accepting this evidence as true, however, the court cannot agree that the officers were required to cease all investigative efforts at the moment they came into contact with plaintiff.  Rather defendants were entitled to continue to detain plaintiff, at least initially, to determine whether the situation was in fact a medical emergency or a case of driving under the influence ("DUI").[12]  Thus, plaintiff has failed to create a genuine factual issue as to

_____

however, the court will address plaintiff's allegations regarding defendants' use of force and violence as part of those claims.

[11] Defendants dispute that Raech and Carboni should have noticed the medical alert decal, noting that it was dark at the time of the encounter and that the windshield of plaintiff's truck is shaded, and arguing that "[t]he combination of the ambient darkness and the shaded windshield made the sticker virtually invisible to the officers."  (Defs.' Mem. 12.)  At the summary judgment stage, however, the court must view the facts in the light most favorable to plaintiff.

[12] In his report, Williams opines that "[r]easonable, well trained and prudent thinking police officers would have determined that [plaintiff] was having an emergency and was in dire need of medical attention for his diabetes attack."  (*Id.* at 8.)  However, Williams does not suggest that the defendant officers should have made this determination without any further

whether his seizure by defendants was justified at its inception.

As to "the method with which the defendant(s) carried out the investigation" (Pl.'s Mem. 5), however, the court reaches the opposite conclusion. The defendant officers were dispatched to the scene to investigate a possible DUI. (Defs.' Exs. D (Incident Investigation Report), J (use of force report completed by defendant Raech).) Plaintiff testified that after he had complied with Raech's command to turn the truck off and as he was attempting to comply with Raech's further order to get out of the truck, defendants grabbed him, threw him to the ground, and proceeded to handcuff him. (Pl.'s Dep. 37-38, 45-47.) The defendants quickly discovered plaintiff's insulin pump while he was on the ground and appear to have regarded the situation solely as a medical emergency after that point, conducting no further investigation of plaintiff and instead waiting for an ambulance to arrive. Nevertheless, plaintiff testified that he remained handcuffed and leaned up against the tailgate of his truck until after the ambulance arrived and paramedics treated him some ten to thirty minutes later.[13] (Pl.'s Dep. 56, 60.) Accepting this evidence as true, as I must for purposes of this motion, a reasonable juror could find that the defendants exceeded the bounds of a permissible investigative detention, and that the detention

investigation. (*See id.* at 7 (faulting defendants for not conducting an appropriate investigation of a suspected DUI person and for "negligently disregard[ing] trained policy and procedures that would have and should have clearly shown that [plaintiff] was suffering from a medical problem and not that of alcohol inebriation").)

[13] Although it is not clear from the record exactly how long plaintiff was handcuffed, it is undisputed that Raech arrived at the scene at 9:42 p.m., and that the ambulance was called at 9:50 p.m., arrived at 9:59 p.m., and departed by 10:21 p.m. (Defs.' Mot. ¶¶ 15, 28, 31; Pl.'s Resp. ¶¶ 15, 28, 31; Defs.' Ex. G (ambulance records).) Plaintiff was handcuffed before the ambulance was called, and, according to plaintiff, the handcuffs were not removed until after the paramedics arrived and treated him. Thus, it would appear that plaintiff was in handcuffs from no later than 9:50 p.m. until some point between 9:59 p.m. and 10:21 p.m.

thus became a *de facto* arrest unsupported by probable cause.

In considering whether an investigative detention has escalated into an arrest "the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995). "There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Id.* at 1193. Nevertheless, as numerous courts have recognized, "handcuffs are restraints on freedom of movement *normally* associated with arrest," such that "the use of handcuffs substantially aggravates the intrusiveness of a *Terry* stop." *United States v. Glenna*, 878 F.2d 967, 973 (7th Cir. 1989).[14] Accordingly, the use of handcuffs during an investigative seizure "must be justified by the circumstances." *Baker*, 50 F.3d at 1193.

Applying these principles, the Third Circuit has held that the use of handcuffs as part of a *Terry* stop does not convert the detention into an arrest where handcuffs are reasonably necessary for the officers to protect themselves and to maintain the status quo.[15] Similarly, the Third

_____

[14] *See also, e.g.*, *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009) ("The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest.") (citation and internal quotation marks omitted); *United States v. Acosta-Colon*, 157 F.3d 9, 18 (1st Cir. 1998) ("There is no question that the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, 'substantially aggravates the intrusiveness' of a putative *Terry* stop.") (quoting *Glenna*, 878 F.2d at 972); *Washington v. Lambert*, 98 F.3d 1181, 1188 (9th Cir. 1996) (observing that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop") (citation and internal quotation marks omitted).

[15] *United States v. Goode*, 309 F. App'x 651, 653-54 (3d Cir. 2009) (unpublished) (drawing gun, ordering defendant to the ground, and handcuffing him did not exceed the bounds of an investigatory stop where defendant was suspected of drug dealing, a crime frequently associated with weapons and violence; where defendant had instigated his partner's flight from the scene; and where officer knew that defendant was suspected of being the gunman in an

13

Circuit has upheld as reasonable a *Terry* stop in which an officer removed a passenger from a stopped vehicle using a control hold and placed him face down on the sidewalk where the stop followed a car chase in which the offending vehicle had collided with several cars before crashing to a stop, and where the officer conducting the stop was alone, his partner having run after the driver of the offending vehicle, who had fled the scene on foot. *United States v. Persinger*, 284 F. App'x 885, 888-89 (3d Cir. 2008) (unpublished).

In contrast, where there is no basis to believe that the suspect poses a threat or to fear his escape, the use of intrusive investigative methods like handcuffs may amount to an arrest. *See Baker*, 50 F.3d at 1193. In *Baker*, a § 1983 action brought by four family members who arrived at the apartment of their son and brother just as the police were launching a drug raid on the apartment pursuant to a "no-knock" warrant, officers involved in the raid had pushed the plaintiffs to the ground, pointed guns at them, and handcuffed them for a period of about twenty-five minutes while the raid was executed. *Id.* at 1188-89, 1192-93. Noting that the use of guns and handcuffs and the length of the detention "shows a very substantial invasion of [plaintiffs'] personal security," the court held that the officers' use of these "intrusive methods without any reason to feel threatened by [plaintiffs], or to fear [they] would escape" was sufficient to support

---

unrelated shooting); *United States v. Hawkins*, 280 F. App'x 117, 120-21 (3d Cir.) (unpublished) (officers did not convert *Terry* stop into an arrest by ordering suspects out of their vehicle, handcuffing them, and placing them in separate police cars while their vehicle was searched where police were investigating a report of gunshots being fired into a residence and thus had reason to believe "not only that the people in the [vehicle] were armed, but also that at least one of them had fired a weapon into a residence only minutes earlier"), *cert. denied*, 129 S. Ct. 237 (2008); *see also Woodlen v. Jimenez*, 173 F. App'x 168, 171 (3d Cir. 2006) (unpublished) (even if use of handcuffs and placement of plaintiff suspected of driving a stolen vehicle inside squad car was not justified based on plaintiff's yelling at and angry questioning of officers, right to be free from physical restraint in these circumstances was not clearly established where officers "could reasonably conclude that [plaintiff's] conduct could have been threatening").

a finding that plaintiffs' Fourth Amendment rights were violated.  *Id.* at 1193.  In reaching this conclusion, the court relied on the Ninth Circuit's decision in *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990), in which that court held that an investigative stop of an individual suspected of involvement in drug trafficking was converted into an arrest based on the officers' use of guns and handcuffs against the suspect, who was also forced to lie down on the street, where the suspect was cooperative and in the absence of any evidence suggesting that he was particularly dangerous.  *See Baker*, 50 F.3d at 1193 (citing *Del Vizo*).

Here, as in *Baker*, viewing the facts in the light most favorable to plaintiff, as I must do at this stage, a reasonable juror could find that there was no reason for the defendants to feel threatened by plaintiff or to fear that he would flee the scene.  Like the suspect in *Del Vizo*, plaintiff, by his own account, was cooperative, having complied with the officers' request that he turn off his truck.  Although the officers certainly were justified in ordering him out of the truck as part of their investigation, *see Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1997),[16] plaintiff testified that he had begun to comply with this demand, too, without delay, but that before he could do so, defendants forcibly removed him from the truck and handcuffed him on the ground.  Significantly, Raech and Carboni were investigating plaintiff only as a possible DUI suspect, and there was thus no reason to believe, especially once the truck had been turned off, that he would be particularly dangerous.  It is also significant that, according to plaintiff, there were three officers on the scene initially, while plaintiff was alone in his truck.  *Cf. Persinger*, 284 F. App'x at 889 (citing fact that officer was alone with suspect as a factor supporting

---

[16] "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.*

reasonableness of officer's forcible removal of suspect from his vehicle to the ground in order to question him safely).  However, accepting plaintiff's evidence as true, a reasonable jury could conclude that the intrusive methods used by the officers were not justified under the circumstances and that the detention therefore became an arrest for which probable cause was required.[17]

Moreover, as noted, plaintiff contends that he remained handcuffed even after defendants discovered his insulin pump and ceased investigating him as a possible DUI suspect.  Defendants have produced no evidence that Raech and Carboni took any further steps to investigate whether plaintiff had been driving under the influence of alcohol or a controlled substance once they discovered plaintiff's insulin pump.  (*See* Williams Report 7 (finding "no indication that any type of investigation [of the reported DUI complaint] or appropriate interview took place").)  To the contrary, Carboni testified that once the pump was discovered, one of the officers on the scene called an ambulance (Carboni Dep. 35), and Raech stated that "there was no further need for [him] to examine [plaintiff] at that point" because an ambulance was on the way (Raech Dep.

---

[17] Defendants seek to portray plaintiff as "actively resisting police efforts to take him into custody."  (Defs.' Reply 2.)  At the summary judgment stage, however, the court must view the facts in the light most favorable to plaintiff, who testified that he did not resist the officers.  (Pl.'s Dep. 46.)  Plaintiff acknowledged that it is possible that he may have been flailing his arms while inside the truck.  (*Id.* at 41.)  However, it is far from clear that the officers could reasonably have perceived him to be resisting in light of (1) plaintiff's own description of the possible flailing as a lack of muscular control in the sense that when reaching for something, his hand would be flopping about somewhat (*id.* at 116; *see also id.* at 42); (2) his compliance with the officers' verbal commands (*id.* at 37-38); (3) his statement to the officers that he was diabetic and experiencing low blood sugar (*id.*); and (4) Raech's testimony that he did not perceive plaintiff as trying to hurt him (Raech Dep. 85).  The other "resistance" that defendants focus on—plaintiff's admission that he thrashed the upper part of his body and tried to move his legs while the officers were handcuffing him because he was in pain—did not occur, by plaintiff's account, until after he had been pulled from the truck and thrown to the ground and thus after the officers had already exceeded the bounds of a permissible *Terry* stop.  (Pl.'s Dep. 81-82.)

102).  Although Raech testified that he did not come to a determination as to whether plaintiff

had a medical condition (*id.* at 101), the ambulance records reflect that the ambulance was

dispatched to respond to a "diabetic emergency" (Defs.' Ex. G (ambulance records)).  Yet,

according to plaintiff, he remained handcuffed and leaned up against the tailgate of his truck until

after the paramedics arrived, cleaned him up, gave him a blood test, gave him glucose, and gave

him a second blood test.  (Pl.'s Dep. 60.)  Plaintiff alleges that, as a result of this continued

detention, medical attention was delayed, as he was prevented from using the medical supplies in

his truck to test and treat his blood sugar.  (*See* 1st Am. Compl. ¶¶ 27, 43, 59; *see also* Pl.'s Dep.

56, 64 (while plaintiff was handcuffed and waiting for the ambulance to arrive, a Valley

Township police officer denied plaintiff's request to use medical supplies in his truck).)  In these

circumstances, a reasonable juror could conclude that following their discovery of the insulin

pump, the officers ceased any investigation of their initial suspicions and treated plaintiff solely

as someone experiencing a medical problem, and that their continued detention of plaintiff in

handcuffs beyond that point was unreasonable.  *See Baker*, 50 F.3d at 1193 (use of guns and

handcuffs not justified where police had no reason to feel threatened by plaintiffs or to fear their

escape).

Defendants contend that they had no choice but to detain plaintiff to ensure that he did

not drive away while still in an impaired state.  (*See* Defs.' Reply 4 ("Plaintiff cannot seriously

suggest that the officer should have just left the Plaintiff in his extended pickup truck and hope

that he recovered his sense before driving home again.").)  The court agrees that defendants were

justified in preventing plaintiff from getting back in his truck and driving off, given his admitted

impairment.  *See Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001) (even absent reasonable

suspicion, officers were justified in detaining possibly intoxicated individual who had locked himself in his car as part of their community caretaking function). However, there is no evidence that they needed to keep plaintiff handcuffed in order to do so. (*See* Raech Dep. 101-02 (acknowledging that plaintiff "started to calm down and start[ed] making a little bit of sense" prior to the ambulance getting there).)

Because the court concludes that a reasonable jury could find that the seizure became a *de facto* arrest when the defendants officers forcibly removed plaintiff from his truck and handcuffed him, or when they continued to keep him in handcuffs at the scene even after the situation had become a medical emergency response, the court must also address the issue of probable cause. Raech and Carboni argue that they had "ample probable cause to take the Plaintiff into custody" based on the 911 call and plaintiff's demeanor.[18] (*See* Defs.' Mem. 5-6.) A reasonable jury, however, could find otherwise. *See Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978) ("[T]he question of probable cause in a § 1983 damage suit is one for the jury.").

Probable cause to make a DUI arrest is determined based on the totality of the circumstances and exists "where the officer has knowledge of sufficient facts and circumstances to warrant a prudent person to believe that the driver has been driving under the influence of alcohol or a controlled substance." *Commonwealth v. Angel*, 946 A.2d 115, 118 (Pa. Super. Ct.

---

[18] Defendants also cite plaintiff's failure to respond to Raech's questioning or comply with Raech's request to get out of the truck (*see* Defs.' Mem. 6; Defs.' Reply 1), but the facts regarding plaintiff's responsiveness are disputed, and it is plaintiff's evidence that must be believed at the summary judgment stage. Plaintiff testified that he answered the officers' specific questions and that when he was told to get out of his vehicle, he "reached for [his] seat belt, and before [he] got to [his] seat belt, [he] was pulled out and [he] hit head first on the pavement." (Pl.'s Dep. 38, 43.) Plaintiff specifically denied having delayed in getting out of the truck, and he said that it would be incorrect to characterize him as being unresponsive and not following the officers' verbal commands. (*Id.* at 43-44.)

18

2008) (citation and internal quotation marks omitted).  Where a suspect is stopped following a pattern of erratic driving, probable cause to arrest exists where the suspect also exhibits signs of intoxication such as the odor of alcohol, bloodshot eyes, slurred speech, and failure to perform sobriety tests.  *See, e.g.*, *Commonwealth v. Hughes*, 908 A.2d 924, 928 (Pa. Super. Ct. 2006) (erratic driving, coupled with odor of alcohol, bloodshot eyes, and failure to perform field sobriety tests).  The erratic driving supplies reasonable suspicion to stop the car, and the signs of intoxication supply probable cause to arrest the driver for DUI.  *See id.*

As defendants note (Defs.' Mem. 6), plaintiff acknowledged that when the officers encountered him his speech was somewhat impaired (though still comprehensible) (Pl.'s Dep. 42-43), and that he was confused and disoriented during his diabetic incident (*id.* at 34), symptoms that can be indicative of intoxication, *see Commonwealth v. Hilliar*, 943 A.2d 984, 991 (Pa. Super. Ct.) (including "slurred speech" and "generally disoriented . . . nature of the driver" among factors that might contribute to a finding of probable cause), *appeal denied*, 956 A.2d 432 (Pa. 2008).[19]  However, Raech testified that he did not smell the odor of alcohol at any time during the encounter with plaintiff (Raech Dep. 115), and there is no evidence that plaintiff's eyes were bloodshot or that sobriety testing was attempted (*see* Williams Report 7 (remarking upon officers' failure to perform standard sobriety testing)).  In addition, plaintiff testified that he disclosed to the officers that he was diabetic and suffering from low blood sugar,

---

[19] The extent to which plaintiff was experiencing these symptoms at the time of the incident is unclear, as plaintiff also testified that by the time the officers approached his truck the soda he had started drinking had begun to take effect and he was "coming out" of the reaction. (*Id.* at 43.)  Plaintiff also acknowledged that it was possible that he was flailing his arms inside the truck in the sense of not having complete muscular control when moving his arms (*id.* at 41-42, 116), but the court has been presented with no evidence that this is a symptom of intoxication.

and that there were other objective indicators—the medical alert decal and necklace—that plaintiff was a person with a medical condition. (Pl.'s Dep. 37-38, 74-75, 85-86.) Thus, by plaintiff's account, when the officers approached him in his truck, they were confronted with someone (1) who was obviously impaired, (2) who did not smell of alcohol, and (3) whom they had reason to believe was experiencing a medical emergency. In these circumstances, accepting plaintiff's version of events as true, a reasonable juror could find that defendants lacked probable cause to arrest plaintiff for DUI when they forcibly removed him from his truck and handcuffed him. *Cf. Hirsch v. Burke*, 40 F.3d 900, 903 (7th Cir. 1994) (officer reasonably could have concluded that plaintiff was committing misdemeanor of public intoxication where plaintiff had trouble balancing himself, appeared incoherent, smelled of alcohol, had bloodshot eyes, and was unable to state his name or date of birth, and where plaintiff at no time indicated that he was diabetic and officer did not discover anything, "such as a medical identification tag or bracelet, that would have put him on notice that [plaintiff] was a diabetic").

The court thus concludes that plaintiff has produced evidence from which a reasonable juror could conclude that the seizure of plaintiff's person, although justified at its inception, became unreasonable by virtue of the intrusive means by which it was effected and therefore violated the Fourth Amendment.

### b.    Qualified Immunity

Under the doctrine of qualified immunity, "officers performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). Having determined that, viewed in the light most favorable to plaintiff, the record evidence is sufficient for a reasonable jury to find a violation of plaintiff's Fourth Amendment right to be free from unreasonable seizures, the court must next assess whether the particular right infringed was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[20] A right is clearly established for purposes of the qualified immunity analysis when the "contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (citation and internal quotation marks omitted). The very action in question need not previously have been held unlawful in order for a right to be clearly established. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Rather, the unlawfulness must be apparent in light of pre-existing law. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Although qualified immunity ordinarily should be resolved at the earliest possible stages of litigation, summary judgment on the issue of qualified immunity is inappropriate where there are disputed, historical facts material to the objective reasonableness of an officer's conduct. *See Curley*, 298 F.3d at 277-78.

As of the time of the incident, the law was clear that the use of handcuffs during a *Terry* stop is not permitted as a matter of course but "must be justified by the circumstances." *Baker*, 50 F.3d at 1193; *see also* cases cited at n.14, *supra*, and accompanying text. Although there

---

[20] In *Pearson v. Callahan*, __ U.S. __, __, 129 S. Ct. 808, 818 (2009), the Supreme Court held that the sequence of the two-pronged qualified immunity analysis set forth in *Saucier* is no longer mandatory and that trial courts now have discretion to determine which of the two prongs of the analysis to apply first.

was—and is—no bright line rule, case law in this and other circuits established that the use of intrusive methods such as handcuffs is not justified when a suspect is compliant and officers have no reason to feel threatened by the suspect or to fear his escape. *See Baker*, 50 F.3d at 1193; *see also Smoak v. Hall*, 460 F.3d 768, 781-82 (6th Cir. 2006) (use of guns, handcuffs, and detention in a police cruiser was unreasonably intrusive where officers possessed only a "bare inference" that plaintiffs had been involved in a "possible robbery" and where plaintiffs had obediently complied with officers' orders)[21]; *Acosta-Colon*, 157 F.3d at 19 (use of handcuffs as part of a *Terry* stop is not justified in the absence of "*some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm"). As discussed above, accepting plaintiff's version of the facts as true, a reasonable juror could find that plaintiff was cooperative when Raech and Carboni encountered him and that the officers had no reason to feel threatened by him or to believe that he would flee. Moreover, plaintiff has also produced evidence from which a reasonable juror could conclude that the officers should have recognized at the outset that plaintiff was experiencing a medical problem. In these circumstances, a reasonable officer would know that forcibly removing plaintiff from his vehicle and handcuffing him was unlawful. Likewise, accepting plaintiff's evidence as true, a reasonable officer would know that it was

---

[21] Although the court in *Smoak* concluded that the plaintiffs' evidence was sufficient to show that their seizure by the defendant officers violated their Fourth Amendment rights "because it became an arrest without probable cause," the court nevertheless held that the defendants were entitled to qualified immunity because Sixth Circuit case law had "endorsed the use of guns and handcuffs during a felony stop, even if only as part of an investigatory seizure." *Id.* at 782. Of course, the plaintiff in this case was stopped on suspicion of a misdemeanor, not a felony.

unlawful to continue to detain plaintiff in handcuffs even after the situation had evolved from a

DUI investigation into a medical emergency response in the absence of evidence that such

restraint was necessary to keep him at the scene.

Defendants argue that their actions were objectively reasonable because the medical alert

decal on plaintiff's truck was not readily visible to them and because, regardless of the cause of

plaintiff's conduct, he was "out-of-control" and had been the subject of a citizen's complaint of

erratic driving. (*See* Defs.' Mem. 12; Defs.' Reply 4.) However, the extent of plaintiff's

responsiveness to the officers' questioning and commands and, indeed, the extent of his

impairment are very much in dispute, as is the issue of whether and when the officers had notice

of plaintiff's medical condition. The court is not free to resolve these disputed factual issues,

which bear directly on the objective reasonableness of the officers' conduct. *See Barton v.

Curtis*, 497 F.3d 331, 335 (3d Cir. 2007) ("[I]f there are facts material to the determination of

reasonableness in dispute, then that issue of fact should be decided by the jury."); *Curley*, 298

F.3d at 282 (noting that the "standard for granting or denying a motion for summary judgment

does not change in the qualified immunity context") (citation and internal quotation marks

omitted).

Finally, as to the issue of probable cause, because the facts regarding the extent of

plaintiff's impairment and the notice defendants had of plaintiff's medical condition are disputed,

the court cannot decide whether a reasonable officer would have believed there was probable

cause to arrest plaintiff for DUI in the circumstances of this case. *See Barton*, 497 F.3d at 335.

Accordingly, the court concludes that defendants are not entitled to summary judgment

on basis of qualified immunity, and the court will therefore deny the summary judgment motion

as to Counts I and II.

### 2. Excessive Force (Counts III and IV)

#### a. Constitutional Violation

Claims for excessive force arising in the context of an arrest or investigatory stop are properly analyzed under the Fourth Amendment's "reasonableness standard." *Graham*, 490 U.S. at 395. Because this test of reasonableness "'is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citation omitted). Other factors that may bear on the reasonableness of an officer's use of force include "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). In determining whether a particular use of force is constitutionally actionable, "the question is whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The reasonableness of the force at issue "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

Plaintiff has produced evidence that, in the course of investigating him for a suspected DUI, Raech grabbed him and "[f]lipped him head first onto the road" after he had complied with

Raech's instruction to turn his truck off and as has was attempting to comply with Raech's order to get out of the truck. Plaintiff's evidence also shows that once he was out of the truck, Raech and/or Carboni jumped on his back and shoulders and jumped on, hit, or kicked his legs, and that all of this happened after he had informed Raech that he was diabetic and suffering from low blood sugar. While defendants contend that Raech and Carboni used only the amount of force necessary to subdue plaintiff in light of his resistance, plaintiff's evidence, which must be believed at this stage, suggests otherwise. Accepting plaintiff's evidence as true, a reasonable jury could find that the force used by Raech and Carboni was objectively unreasonable.

At the time of the incident, the officers were investigating plaintiff for a suspected DUI based on a report that he had been driving erratically. Although the officers thus had reason to believe that plaintiff was intoxicated or otherwise impaired, there was no reason to believe, based on the nature of the offense itself, that plaintiff would be violent.

Nor was there any reason to believe that plaintiff posed an immediate threat to anyone's safety. Defendants argue that plaintiff's driving in an admittedly impaired state put both himself and other motorists and pedestrians at risk (Defs.' Reply 2), but by the time Raech and Carboni encountered plaintiff, his truck was stopped, and, in plaintiff's version of events, he immediately complied with Raech's order to turn off the ignition (Pl.'s Dep. 37). Although it is true, as defendants suggest, that plaintiff was exhibiting some signs of physical distress when Raech approached, including sweating and flailing his arms, plaintiff testified that he explained to Raech—speaking comprehensibly, if not entirely clearly—that he was diabetic and that his sugar had dropped (*id.* at 37-38), and the medical alert decal on the windshield of the truck and medical alert necklace on plaintiff's person also supported the inference that plaintiff had a medical

condition.  Raech himself acknowledged that plaintiff was not trying to hurt him.  (Raech Dep. 85.)  Moreover, notwithstanding his apparent physical distress, plaintiff nevertheless proceeded to comply with Raech's orders first to turn off and then to get out of the truck.  (Pl.'s Dep. 37-38.)[22]

Finally, while defendants contend that the use of force by Raech and Carboni was justified by plaintiff's resistance (Defs.' Mem. 9), plaintiff disputes having resisted the officers, and I must accept that fact for this purpose.  Defendants focus on plaintiff's concession that he thrashed his upper body and tried to move his legs, even though the officers had told him to hold still.  (*Id.* at 9; Defs.' Reply 5.)  But according to plaintiff, this "resistance" did not begin until *after* Raech had grabbed him and flipped him head first onto the road.  (Pl.'s Dep. 81-82.)  Plaintiff disputes having resisted the officers at all before he was on the ground.  (*Id.* at 46.)  While defendants assert that Raech and Carboni "had every reason in the world to remove the Plaintiff from his vehicle under the circumstances" (Defs.' Reply 5), accepting plaintiff's account of events as true, a reasonable jury could find that there was no reason for the officers to remove him *forcibly* because he was in the process of complying with Raech's verbal command to get out of the truck, having already complied with Raech's earlier command to turn off the ignition.  (Pl.'s Dep. 37-38; *id.* at 46-47 (officers asked plaintiff to get out of the truck and then, without

---

[22] Although defendants note that they "had no idea what [plaintiff] had in his truck as far as drugs, weapons or anything else" (Defs.' Reply 2), they do not suggest that they had reason to believe that plaintiff in fact possessed any drugs or weapons.  The possibility that a driver of a vehicle involved in a traffic stop might be armed was among the considerations that led the Supreme Court to hold that an officer may order a driver out of his vehicle in conducting a lawful traffic stop.  *See Mimms*, 434 U.S. at 110 (citing a 1963 study finding that "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile") (citation and internal quotation marks omitted).  But without more, that mere possibility does not justify forcibly removing a cooperative driver from his vehicle.

waiting for him to do so, pulled him out).) Indeed, that force was unnecessary is underscored by plaintiff's testimony that he also had just informed Raech that he was diabetic and suffering from low blood sugar.[23] (*Id.* at 37-38.) Moreover, even if the officers were justified in using some force against plaintiff after he was on the ground, the force they applied to subdue him—which, as described by plaintiff, included an officer "jump[ing] on [his] back, on [his] shoulders very hard" and then "jumping on, hitting or kicking [his] legs (*id.* at 38)—was such that a reasonable jury could find it excessive.

Defendants cite three cases in which district courts have entered summary judgment in favor of police officers on pre-arrest excessive force claims, but none of those cases requires a different conclusion here. Like this case, *Gruver v. Borough of Carlisle*, No. 05-1206, 2006 WL 1410816, at *2 (M.D. Pa. May 19, 2006), on which defendants primarily rely, involved a diabetic plaintiff who suffered a hypoglycemic attack while driving. After the plaintiff stopped his car in a convenience store parking lot, a police officer approached him, having received a report from a witness who had observed plaintiff driving erratically. *Id.* At some point during the encounter, the plaintiff got out of his car and began to walk toward the convenience store, allegedly in a disoriented fashion. *Id.* The officer attempted to detain plaintiff to safeguard him from traffic in the parking lot, and when plaintiff did not respond to the officer's verbal commands and physically resisted being pulled back toward his car, the officer knocked him to the ground and started to handcuff him. *Id.* at *2-*3. Then, when plaintiff continued to struggle, a backup

---

[23] As defendants observe (Defs.' Mem. 11; Defs.' Reply 2), plaintiff acknowledged the possibility that he may have been flailing his arms while inside the truck, but as noted above, *see* n.17 *supra*, it is far from clear that the officers reasonably could have perceived him to be resisting.

officer who had been called to the scene tased plaintiff with a stun gun three times. *Id.* at *3.

Unlike in this case, where plaintiff denies having resisted Raech's commands, there apparently was no dispute in *Gruver* that the plaintiff resisted the defendant officer's verbal commands as well as the officer's efforts to physically detain him. Moreover, although the plaintiff in *Gruver* argued that the force used by the defendant officers was objectively unreasonable,[24] the court in that case had the benefit of a videotape of the incident, which revealed that the plaintiff had "struggled against the Officers for several minutes in their attempt to restrain him, and only became subdued once he was tasered." *Id.* at *5. Based on this evidence, the court was able to conclude that officers use of force "was consistent with the level of the Plaintiff's resistance." *Id.* No similarly conclusive evidence exists in this case.

Like *Gruver*, *Modugno v. Pennsylvania State Police*, No. 00-3312, 2001 WL 1382279 (E.D. Pa. Nov. 6, 2001), and *Mitchell v. Yeadon Borough*, No. 01-1203, 2002 WL 265021 (E.D. Pa. Feb. 22, 2002), the other cases cited by defendants, also address uses of force against indisputably resisting plaintiffs. In *Modugno*, the court found that an officer's use of pepper spray during a traffic stop did not amount to excessive force where the officer resorted to pepper spray only after the plaintiff repeatedly had refused to heed the officer's command that he return to his vehicle, had refused the officer's subsequent order to put his hands on the car and spread his legs, and repeatedly had pulled away from the officer's grip. 2001 WL 1382279, at *5. Noting that the plaintiff admitted having pulled away from the officer at least three times before pepper spray was used, the court observed that it was plaintiff's own actions that had "turned the

---

[24] The plaintiff alleged, for example, that by the time the backup officers arrived on the scene, he was no longer struggling with the original officer but was pinned to the ground. *Id.*

encounter . . . from a routine traffic stop into a physical altercation culminating in the use of pepper spray." *Id.* Similarly, the court in *Mitchell* also held that an officer's use of pepper spray on a plaintiff who resisted being physically restrained prior to being arrested did not amount to excessive force where the officer, responding to a radio call of "Fight," faced a situation posing a "palpable threat of harm." 2002 WL 265021, at *4. As in *Modugno*, the plaintiff in *Mitchell* admitted having resisted the officer's efforts to restrain him, testifying that when the officer grabbed his arm, he snatched it back. *Id.* at *1.

### b. Qualified Immunity

As defendants observe, in the excessive force context, qualified immunity protects officers who make reasonable mistakes as to the level of force that is permissible in particular set of circumstances:

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 205. In arguing that any mistake as to the permissible use of force in this case was reasonable, defendants focus on plaintiff's behavior at the time of the incident as they perceived it, which they contend warranted the use of some force, even though it later became clear that plaintiff was in fact suffering from insulin shock. (*See* Defs.' Mem. 11; Defs.' Reply 5.) As discussed above, however, the facts regarding plaintiff's behavior and what defendants reasonably could infer from that behavior are disputed, as is the amount of force that the officers actually used in their efforts to subdue plaintiff. (*Compare* Pl.'s Dep. 38, 46 (stating that officer

grabbed him and "[f]lipped [him] head first onto the road," then "jumped on [his] back, on [his] shoulders very hard" and "either jump[ed] on, hit[] or kick[ed] [his] legs"), *with* Defs.' Mem. 11 (characterizing force used as "hand holds to remove the Plaintiff from the vehicle, take him to the ground and secure him in handcuffs").)

Viewing the facts in the light most favorable to plaintiff, the "situation [the officers] confronted" was one in which the force they exerted, according to plaintiff, was excessive because plaintiff, although evidencing some impairment, had informed Raech of his medical condition and was complying with Raech's instructions to turn off and get out of his truck. In these circumstances, it would have been clear to a reasonable officer, in light of the factors set forth in *Graham* and *Kopec*, that flipping plaintiff head first onto the road and jumping on his back and shoulders was unlawful. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (acknowledging that, "in an obvious case," the standard set forth in *Graham* can "clearly establish" that force was excessive, "even without a body of relevant case law"); *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (denying qualified immunity on Fourth Amendment excessive force claim where factors relevant to excessive force, which are well recognized, suggested use of low level of force). Accordingly, Raech and Carboni are not entitled to qualified immunity as to plaintiff's unreasonable force claims, and the court will deny the motion for summary judgment as to Counts III and IV.

### B.     Assault and Battery Claims (Counts V and VI)

Defendants argue that summary judgment should be granted as to plaintiff's claims for assault and battery against Raech and Carboni because the force used by the officers was objectively reasonable under the circumstances and is therefore privileged. (Defs.' Mem. 12-13.)

The law in Pennsylvania is clear that a police officer "may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty" and, in making a lawful arrest, "may use such force as is necessary under the circumstances to effectuate the arrest." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). As defendants acknowledge, however, it is "[t]he reasonableness of the force used in making the arrest" that determines "whether the police officer's conduct constitutes an assault and battery. . . . A police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive . . . ." *Id.* As set forth above, factual disputes regarding the extent of the force used by Raech and Carboni and the circumstances surrounding the officers' use of force preclude the court from finding that the force used was reasonable as a matter of law; therefore, the court must deny summary judgment as to Counts V and VI.

### C. Failure to Train Claim (Count VII)

Finally, plaintiff seeks to hold the City of Coatesville liable for Raech's and Carboni's alleged Fourth Amendment violations, alleging that the City has a "policy or custom" of "fail[ing] to adequately train the police department, specifically by failing to train its officers to distinguish between criminal activity and medical emergencies." (1st Am. Compl. ¶ 102; *see also* Pl.'s Mem. 10.) Allegations regarding the inadequacy of police training may serve as the basis for § 1983 liability, but only in those "limited circumstances" in which "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989). Typically, a failure to train municipal employees will be considered deliberate indifference "only where the failure has caused a pattern of violations." *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

Absent evidence of such a pattern, a plaintiff may maintain a failure to train claim only where the particular violation of federal rights at issue is "'a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Id.* (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)).

As defendants note, plaintiff has not produced evidence of a pattern of violations by Coatesville police officers that would have put City decisionmakers on notice that the existing training program was inadequate. *See Bryan County*, 520 U.S. at 407; *City of Canton*, 489 U.S. at 390 n.10. Rather, plaintiff relies on Raech's deposition testimony that "he has never received training with respect to distinguishing between a medical emergency and a criminal act," training that plaintiff contends is required under the mandates of "the Municipal Police Officer's Education and Training Commission as well as the policy and procedures of the City of Coatesville."[25] (Pl.'s Resp. ¶ 40; Pl.'s Mem. 10.) Plaintiff then argues that the fact that this training is required shows that "medical emergencies, such as that experienced by [plaintiff], are usual and recurring situations that police officers must deal with," and that the failure to provide Raech with such training is therefore deliberately indifferent. (*Id.*)[26]

---

[25] Raech testified that although he received first responder training at the police academy, he did not recall being trained (1) to identify people experiencing insulin shock or a diabetic episode or (2) to look for medical alert necklaces or bracelets on people. (Raech Dep. 54-56.) In his written report, plaintiff's law enforcement policy, practice, and procedures expert, James A. Williams, states that the former type of training is required (*see* Williams Report 5 ("Police Officers are required to be trained as first responders to render first aid and CPR and to recognize symptoms of Diabetic Coma/Insulin Shock specifically.")), but he does not specifically address training requirements as to the latter. Nor does he address any requirement that officers be trained to "distinguish[] between a medical emergency and a criminal act."

[26] Plaintiff also asserts that the fact that the training is required shows that prior events "evidenc[ed] . . . a need" for the training (Pl.'s Mem. 10), but plaintiff has produced no evidence regarding any such prior events, much less evidence that any such events involved use of force

To show that a failure to train amounts to deliberate indifference in the absence of a pattern of violations, the plaintiff must show both that the situation requiring the specific training is likely to recur and that officers lacking the training will frequently violate citizen's federal rights. *See Bryan County*, 520 U.S. at 409 (noting that "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference'"). Even if the requirement that officers be trained to recognize symptoms of insulin shock reflects policymakers' recognition that police officers are likely to encounter persons experiencing such symptoms, plaintiff has produced no evidence to suggest that officers lacking this training will predictably violate these citizens' constitutional rights. *Cf. A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 582 (3d Cir. 2004) (incident reports filed by juvenile detention center workers regarding conflicts between plaintiff and other residents supported "an inference that recurrent harm to [plaintiff] at the hands of other residents was predictable"). Nor is it obvious that they will do so. *Cf. Berg*, 219 F.3d at 276-77 (potential for constitutional violations in the absence of procedures to guard against mistakes in generating arrest warrants was obvious where design of program was such that merely typing a single incorrect digit could result in wrongful arrest and imprisonment). Indeed, plaintiff's own expert opined that—independent of whether Raech should have recognized that plaintiff was experiencing insulin shock—the medical alert symbols on plaintiff's truck and person and medical supplies in plaintiff's truck, combined with the fact that plaintiff was not acting violently towards the officers, should have alerted Raech to "take appropriate action to facilitate medical

---

against persons suffering from insulin shock.

attention."[27]  (Williams Report 6-7.)

Because plaintiff has failed to produce evidence from which a jury reasonably could conclude that any failure to train by the City of Coatesville amounts to deliberate indifference, the court will grant the motion for summary judgment as to Count VII.[28]

## IV.    Conclusion

For the reasons set forth above, the court will grant defendants' motion for summary judgment as to Count VII, and deny the motion as to Counts I, II, III, IV, V, and VI.  An appropriate order accompanies this memorandum.

---

[27] Although Raech testified that he did not recall being trained to look for medical alert necklaces and bracelets on people, he stated that he was familiar with such medical alert items through his personal experience.  (Raech Dep. 55-56.)

[28] In addition to alleging that the City of Coatesville had a policy or custom of "fail[ing] to adequately train the police department" (1st Am. Compl. ¶ 102), the first amended complaint also alleges that the City "promoted or knowingly or recklessly allowed to exist a policy or custom whereby its officers were engaging in, and not held accountable for, violating the constitutional rights of the citizenship to be free from unreasonable seizures, unreasonable force, [and] cruel and unusual punishment."  (*Id.* ¶ 100.)  Because plaintiff has produced no evidence of such a policy or custom, however, the court will grant the motion for summary judgment as to Count VII in its entirety.